**MEMORANDUM OPINION**

September 11, 2009

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION**

In re:

PATRICK BRYAN MORGAN                              Case No. 08-35607

        Debtor

LUCAS McDONALD

        Plaintiff

v.                                                                              Adv. Proc. No. 09-3021

PATRICK BRYAN MORGAN

        Defendant

BEFORE THE HONORABLE RICHARD STAIR, JR.

UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

    FOR PLAINTIFF:

    WADE W. BOSWELL, ESQ.
    Post Office Box 221
    Knoxville, Tennessee 37901

    L. MARTIN McDONALD, ESQ.
    10805 Kingston Pike, Suite 200
    Knoxville, Tennessee  37934

<u>APPEARANCES (continued)</u>:

<u>FOR DEFENDANT</u>:

GAIL F. WORTLEY, ESQ.
3715 Powers Street
Knoxville, Tennessee  37917

1          THE COURT:  This adversary proceeding is before the court upon Lucas

2   McDonald's Complaint to Determine Non-Dischargeability of Debt filed by the

3   Plaintiff, Lucas McDonald, on March 9, 2009, seeking a monetary judgment against the

4   Defendant and a determination that the judgment is nondischargeable under 11 U.S.C.

5   § 523(a)(2).

6          A bench trial was held on September 1, 2009.  The record before the court

7   consists of thirteen (13) exhibits admitted into evidence along with the testimony of

8   three witnesses, G.T. Ballenger, a real estate appraiser, the Plaintiff, and the Defendant.

9          This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

10          On April 9, 2001, the Defendant acquired a residence at 210 East Spring

11   Street in Oliver Springs, Tennessee, from Paul Duncan for the sum of $17,000.00.  The

12   Defendant received a Warranty Deed from Mr. Duncan and secured the purchase price

13   by the execution of a Deed of Trust encumbering the East Spring Street property.

14   Under the terms of the Promissory Note, the Defendant was to make monthly payments

15   to Mr. Duncan of $500.00 over the life of the Note which matured on October 10, 2004.

16          Under the terms of an oral agreement between the Plaintiff, the Defendant,

17   and Shane Depew, who shared occupancy of the East Spring Street residence, all three

18   were to jointly own the East Spring Street residence notwithstanding that it was titled

19   solely in the Defendant's name.  The agreement between the parties, which is

20   essentially undisputed, was that the Plaintiff, Defendant, and Shane Depew were to

21   share equally in making the $500.00 monthly mortgage payments, were to share the

22   expenses in maintaining the property, including the payment of property taxes, and,

23   when the mortgage was paid off, the property was to be sold with the proceeds to be

24   divided equally.  Shane Depew subsequently moved from the property and asked to

25   withdraw from the agreement, which was agreed to by the Plaintiff and Defendant who

thereafter reaffirmed the agreement among themselves with each to now share a fifty percent (50%) ownership interest in the East Spring Street residence upon satisfaction of the mortgage.

The Plaintiff upheld his end of the agreement by paying his share of the mortgage, maintenance expenses, and taxes, and the loan was subsequently paid off and the mortgage released on February 24, 2005.

In the Spring of 2005, the Defendant moved from the East Spring Street residence when he married, but the Plaintiff continued to reside on the property. In the Fall of 2006, the Defendant and his wife divorced and he moved back into the East Spring Street residence with the Plaintiff. At that time, he approached the Plaintiff about his need, pursuant to an order in the divorce proceeding, to pay off an indebtedness of approximately $11,000.00 on a truck that was financed in his wife's name in order to transfer the vehicle into the name of the Defendant. The Plaintiff agreed that the Defendant could borrow that money against his, that is, the Defendant's, one-half (½) interest in the East Spring Street residence. On November 13, 2006, the Defendant executed a Loanliner Application with ORNL Federal Credit Union, seeking $30,000.00 for "miscellaneous personal expenses" and pledging the East Spring Street residence as collateral pursuant to a Revolving Credit Deed of Trust also executed on November 13, 2006.

In the Summer of 2008, the Defendant informed the Plaintiff that he was no longer interested or financially able to maintain their investment in the East Spring Street residence. The parties engaged in discussions concerning the best means to divide their respective one-half (½) interests, including the Defendant buying out the Plaintiff's interest for $15,000.00, although no agreement was reached. Thereafter, on August 20, 2008, the Defendant, along with his then spouse, Julnar A. Morgan,

4

executed a Loanliner Application with ORNL Federal Credit Union to borrow an additional $10,000.00, once again for "miscellaneous personal expenses" and once again pledging the East Spring Street residence as collateral pursuant to a Modification Agreement to the original Deed of Trust, whereby the Defendant and Julnar Morgan executed a Mortgagor's Agreement, combining the two loans into one $40,000.00 obligation.  In October 2008, the parties had discussions concerning disposing of the East Spring Street residence and getting out of the investment, but they were still unable to reach an agreement.  Thereafter, the Plaintiff vacated the East Spring Street residence and, on December 1, 2008, he filed a complaint against the Defendant in the Chancery Court for Anderson County, alleging damages for conversion, fraud, and breach of contract.

The Defendant filed the Voluntary Petition commencing his case under Chapter 7 on December 12, 2008.  In his Schedule A, the Defendant valued the East Spring Street residence at $26,000.00, subject to the liens of ORNL Federal Credit Union in the amount of $40,000.00, which are listed on Schedule D.  He also scheduled the Plaintiff as an unsecured nonpriority creditor, holding a claim in the amount of $1.00 pursuant to the pending lawsuit in the Anderson County Chancery Court.

The Plaintiff filed the Complaint initiating this adversary proceeding on March 9, 2009, averring that the Defendant made false statements and misrepresentations upon which the Plaintiff relied when he agreed to allow the Defendant to borrow money against the East Spring Street residence, under the representation that he was only going to borrow enough to pay off the truck as required through his divorce.  The Plaintiff also originally sought a determination under 11 U.S.C. § 523(a)(6) that the Defendant converted his property, but that request for relief was orally withdrawn prior to trial.

The dischargeability of debts is governed by 11 U.S.C. § 523, which as material to this adversary proceeding, provides that:

> (a) A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt— . . .
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

Section 523(a) is construed liberally in favor of debtors and strictly against the party seeking a determination of nondischargeability, who bears the burden of proving the necessary elements by a preponderance of the evidence. *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991); *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

In order to satisfy the requirements of § 523(a)(2)(A), the Plaintiff must first prove that the Defendant obtained money, property, or services through material misrepresentations which he knew were false or were made with gross recklessness, that the Defendant intended to deceive the Plaintiff, that he justifiably relied upon the Defendant's false representations, and that his reliance was the proximate cause of his loss. *See Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).

The Plaintiff must prove that the Defendant made material misrepresentations or "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision" and that he engaged in conduct that was "somewhat blameworthy." *Copeland*, 291 B.R. at 759, 761 (quoting *Candland v. Insurance*

*Company of North America (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996)).

> "[F]alse pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation[, while a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another - something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

*Copeland*, 291 B.R. at 760.  For the purposes of § 523(a)(2)(A), "false representations and pretenses encompass statements that falsely purport to depict current or past facts." *Peoples Security Finance Company, Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983).

Next, the Plaintiff must prove that the Defendant made false representations which he knew or should have known would induce or convince the Plaintiff to provide him with the authorization to encumber the East Spring Street residence.  "'Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . . A 'dumb but honest' [debtor] does not satisfy the test.'" *Copeland*, 291 B.R. at 766 (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)).  It may be "inferred as a matter of fact" based on the totality of the circumstances by examining the Defendant's conduct to determine if he presented the Plaintiff with "'a picture of deceptive conduct . . . indicat[ing] an intent to deceive.'" *Copeland*, 291 B.R. at 766 (quoting *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Colo. 2002)).  "As applied to § 523(a)(2)(A), 'the concept of misrepresentation includes a false representation as to one's intention, such as a promise to act.  A representation of the

Case 3:09-ap-03021-rs   Doc 28   Filed 09/17/09   Entered 09/17/09 13:57:46   Desc
Main Document      Page 8 of 14

maker's own intention to do … a particular thing is fraudulent if he does not have that intention' at the time he makes the representation.'" *Copeland*, 291 B.R. at 763 (quoting *Palmacci*, 121 F.3d at 786).

Finally, the Plaintiff must prove justifiable reliance; i.e., that he actually relied on the Defendant's representations and, based upon the facts and circumstances known to him at the time, his reliance was justifiable. *Copeland*, 291 B.R. at 767. Nevertheless, justifiable reliance can be found even if the Plaintiff might have discovered the falsity of the Defendant's representations had he investigated them further. *Copeland*, 291 B.R. at 767.

As an initial matter, there is no dispute that the Defendant obtained $40,000.00 in loans from ORNL Federal Credit Union in November 2006 and August 2008, using the East Spring Street residence as collateral, nor do the parties dispute that, in November 2006, the Defendant sought permission from the Plaintiff, as co-owner, to take out a home equity loan in order to pay off his truck and that the Plaintiff agreed that the Defendant could take out a loan of approximately $11,000.00 for that purpose.

This, however, is where the parties' testimony diverges with respect to the remaining loan proceeds received by the Defendant. The Plaintiff testified that he was willing for the Defendant to obtain a loan sufficient to pay off the truck because that amount would not encroach upon the Plaintiff's 50% ownership interest in the East Spring Street residence but that he did not know until August 2008 that the Defendant had taken out and owed loans against the house totaling $40,000.00. He also testified that the Defendant did not tell him after the fact that he had obtained a loan for $30,000.00 and that the Defendant misrepresented that he was paying off the loan, which the Plaintiff believed to be solely for the approximately $11,000.00 truck payoff. The Plaintiff also testified that, based upon his friendship and former status as

8

roommates with the Defendant for many years, he relied on the Defendant's representations, but that he never would have agreed to allowing the Defendant to take loans for more than his interest in the East Spring Street residence, much less against the entire equity.

On the other side, the Defendant testified that he initially requested a loan of $15,000.00 from ORNL Federal Credit Union but was persuaded to instead opt for a $30,0000.00 line of credit to avoid additional closing costs in the event additional funds were needed, and that he discussed the larger loan with the Plaintiff, who knew he was borrowing the entire $30,000.00. The Defendant also testified that he discussed with the Plaintiff taking out the loan for the additional $10,000.00 in August 2008 because they needed to do some work on the East Spring Street residence, although he acknowledged that none of those funds were spent for that purpose. For his part, the Plaintiff unequivocally denied that these discussions occurred and reiterated that he was unaware that the Defendant had borrowed more than the initially agreed upon $11,000.00.

After weighing the testimony and the record before me, the court finds the Plaintiff's testimony that, while he did not dispute authorizing the Defendant's $11,000.00 loan to pay off his truck, he did not agree to the Defendant taking out a loan against 100% of the equity in the East Spring Street residence, to be more credible than that of the Defendant to the contrary. The Plaintiff did not receive the benefit of the loan proceeds, nor were they spent on the house. As discussed previously, when questioned about the amount of the loan, the Defendant testified that he had initially sought a $15,000.00 loan in order to pay off the truck but was persuaded by the Credit Union to go with the $30,000.00 and that he consulted with the Plaintiff about the increase. And although the Defendant's explanation for the increased loan may be

plausible, the fact remains that there would have been no reason or benefit for the Plaintiff to allow the Defendant to encumber his one-half interest in the house, the whole of which he believed was worth between $30,000.00 and $45,000.00 at the time. Likewise, when asked why the Plaintiff would have authorized such a loan, the Defendant had no explanation or convincing rebuttal to the Plaintiff's testimony that he did not.

      The court also finds credible the Plaintiff's testimony that he was unaware that the Defendant had fully encumbered the East Spring Street residence until August 2008, when he read a letter from ORNL Federal Credit Union to the Defendant over the phone at the Defendant's request. The parties had been roommates and friends for many years, and based upon that relationship, the Plaintiff believed – and was justified in his belief – that the Defendant had taken out a loan sufficient only to cover the payoff on the truck, and he had no reason to doubt the Defendant's representations.

      With respect to the loan proceeds, the Defendant testified that he used the $30,000.00 to pay off the truck and to pay living expenses, some legal fees incurred in his divorce, and overages on his credit card. He did, in fact, pay off his truck, as the record reflects that, on November 17, 2006, ORNL Federal Credit Union issued cashier's check #412497, payable to Knoxville TVA Employees' Credit Union and the Defendant in the amount of $11,900.00. The record also reflects, however, in the form of the Defendant's detailed bank records marked as Collective Exhibit 12, that the $13,000.00 advanced by check on November 17, 2006, had, as of November 30, 2006, grown to $14,569.17 through draws and transfers to his checking account totaling $1,569.17. Similarly, by December 30, 2006, the balance of the loan was $16,970.86, an increase of $2,401.69 in the month of December, and it continued to increase each month by sums of $1,048.46 in January, $5,859.48 in February, $4,113.82 in March,

$310.90 in April, and $1,330.74 in May, with a closing balance as of May 31, 2007, six months after the loan was obtained, of $29,634.26. Although the Defendant may have used some of those funds for living expenses as he claimed, a review of the statements themselves evidences that the Defendant spent a large portion of the funds on dining out, entertainment, and various non-essential, non-living expense purchases, all the while representing to the Plaintiff that he was paying on the loan for the truck.

With respect to the additional $10,000.00 loan in August 2008, the Plaintiff testified convincingly that he was not consulted by the Defendant before taking this loan and that he would not have given his consent to further encumber the East Spring Street residence. Moreover, the Defendant testified that he obtained that loan with the intention to do work on the house in order that they could dispose of it, but that none of the $10,000.00 was spent on improvements or repairs to the house.

Taking all of these facts into account, and based upon the record before me, the court finds that the Defendant induced the Plaintiff into agreeing to the November 2006 loan through misrepresentations and false pretenses and that the August 2008 loan was obtained through actual fraud against the Plaintiff. The court also finds that the Defendant did so with an intent to deceive, and that the Plaintiff justifiably relied upon the Defendant's representations.

The Plaintiff seeks a judgment of not less than $15,000.00, which he asserts represents the value of his interest in the East Spring Street residence, plus pre-judgment interest, post-judgment interest, attorney's fees, and the costs of this proceeding. In support of his averment that his one-half interest in the East Spring Street residence was at least $15,000.00, the Plaintiff introduced the testimony and report of G. T. Ballenger, a real estate broker and appraiser, who inspected the house from the outside on August 18, 2009. Based upon Mr. Ballenger's inspection and his

review of photographs of the inside of the house taken by the Defendant and introduced into evidence as Collective Exhibit 6, Mr. Ballenger testified that the East Spring Street residence had a fair market range of value as of August 18, 2009, of between $27,500.00 and $32,500.00.  He further testified that the range of values would have been approximately 10% higher one year ago, prior to the onset of the current housing crisis.

The only other evidence in the record related to the value of the East Spring Street residence is the Defendant's Schedule A, where the Defendant lists the house with a fair market value of $26,000.00, which the Defendant testified was based upon the value assigned by the county tax assessor.  Nevertheless, as this court has held many times, "Tennessee courts do not consider tax appraisals credible evidence of the market value of real property." *In re Northern*, 294 B.R. 821, 828 n.9 (Bankr. E.D. Tenn. 2003).  This is especially true in the present case where credible evidence of the value of the property has been presented.

Based upon the record before me, I find that $30,000.00 represents a reasonable fair market value for the East Spring Street residence and that the Plaintiff is entitled to recoup his one-half interest, or $15,000.00, which the Defendant encumbered in excess of its value with the liens securing the November 2006 and August 2008 loans.  This amount falls in line with Mr. Ballenger's valuations and comports with what the parties considered to be the fair market value based upon their discussions in October 2008.  Although the parties were unable to come to a final agreement regarding disposition of the house, the most viable solution they discussed was a buyout by the Defendant of the Plaintiff's interest for the sum of $15,000.00.

The Plaintiff also seeks pre-judgment interest and attorneys' fees.  "Awards of prejudgment interest are governed by considerations of fairness and are awarded

when it is necessary to make the wronged party whole[,]" and whether to make such an award is left up to the sound discretion of the court. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 818 (9th Cir. 1994); *see also Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1281 (8th Cir. 1988) (finding that since there is no statutory authority mandating the court to award pre-judgment interest, such awards "are discretionary and depend on whether the preferred creditor could have ascertained the amount of the preferential payment without a judicial determination."). If awarded, pre-judgment interest, at the current federal rate prescribed in 28 U.S.C. § 1961, accrues from the date of demand on the defendant or the date that the adversary proceeding commenced. *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 948, 1006 (Bankr. S.D. Ohio 1990); *see also Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 161 B.R. 644, 651 (Bankr. W.D. Tenn. 1993).

Here the court finds that pre-judgment interest is appropriate. By his actions, the Defendant deprived the Plaintiff of the equity in the East Spring Street residence, all the while representing that he had only encumbered his one-half interest. In order to keep from losing his entire investment, the Plaintiff was required to file suit in the Anderson County Chancery Court and subsequently, in this court, and, based upon the failure of the parties to come to an agreement without court intervention, it is unlikely that the Plaintiff could have otherwise ascertained the value and recouped his losses as a result of the Defendant's actions.

Finally, with respect to the requested attorneys' fees, "[i]n Tennessee, courts follow the American Rule, which provides that litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise." *Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). Here, there is no contract or agreement

between the parties that attorney's fees will be paid in the event of a dispute, nor is there a statutory basis for attorney's fees.  The court accordingly cannot award such.

In summary, the Plaintiff will be granted a judgment against the Defendant in the amount of $15,000.00, plus pre-judgment interest to be computed from March 9, 2009, the date the Plaintiff commenced this adversary proceeding, at the Federal Judgment Interest Rate allowed by 28 U.S.C. § 1961(a).  Additionally, pursuant to Rule 7054(b) of the Federal Rules of Bankruptcy Procedure, the Plaintiff will be allowed his costs.  The judgment awarded herein will be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

This Memorandum constitutes findings of fact and conclusions of law as required by FED. R. CIV. P. 52(a), made applicable to this adversary proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  I will not ask the court reporter to transcribe my opinion.  If it is transcribed at the request of either party, Ms. Dunn will present the original to me and I will make such edits and corrections as I deem appropriate before the opinion is filed, after which it will be served on the respective parties.  A judgment will be entered this afternoon.

FILED:  September 17, 2009

/s/ *Richard Stair, Jr.*
RICHARD STAIR, JR.
U.S. BANKRUPTCY JUDGE